Robert Babcock Good morning. My name is Robert Babcock. I represent Keller Foundation, petitioner in one of the two cases. And I was asked to explain how we've kind of cut up the overall 40 minutes. The other petitioner, Mr. Tracy, represented by Mr. Glellen, he and I are splitting the petitioner's 20-minute time, presumably on an approximately equal basis. The government's counsel, Mr. Rolfe, at the end there, is the respondent in one of the cases. So, too, is Global. That's represented by Mr. Alicia. And they are splitting the respondent. And the reason that Mr. Rolfe is there is that for the first time, I think it's maybe the first time in nearly 40 years of doing this, both Mr. Glellen, for Mr. Tracy, and Mr. Rolfe are on my side. And so it's kind of awkward when you start dividing the time among respondents when one of the respondents supports both of the petitioners. And I think, therefore, they've agreed that Mr. Rolfe will go before Mr. Alicia. Breyer, you guys are all good lawyers. I'll let you do it any way you want to do it. You've got 40 minutes. The clock is running. Go. She told me the clock wouldn't start quite yet. As I said, I represent Keller Foundation in this matter, and, of course, it's insurers. And there are — if either of Keller's arguments to this Court are correct, it has to be relieved of the responsibility that was imposed upon it by the administrative law judge and the Benefits Review Board, and responsibility shifted to Global. It's just the workings of, and I think a number of judges on this panel are familiar with it, our local responsibility rule requires that if we win, Global is on the hook. And we think that both of our arguments are clear questions of law entitled to the noble review, but there are some facts that I think would be useful to keep in mind. And that is that all work performed by Tracy for Keller, that's in 96-97, and all subsequent work performed while being employed by Global did contribute, in a physical, medical sense, to the conditions for which the benefits were awarded. And second, particularly dealing with the work activities performed as what we call an expected seaman in Louisiana in 1998, Mr. Tracy had never served as a crew vessel, largely loading it, repairing it, modifying it, getting it ready for the ultimate voyage. I thought he had been hired as a barge foreman. Is that incorrect? The title was barge foreman. The ALJ and the Board found, in effect, that three weeks of work should be considered as, under Chandris, as work of a seaman because it was later, because they both blended it with the subsequent voyage work. But as to the Iroquois, Mr. Tracy had never served as a crew member aboard the Iroquois or performed any work related to the Iroquois until that March 1998. But was he hired as the barge foreman? I thought that's what the administrative agency said. There is reference in the little bit of history. Mr. Tracy, when working for Global before taking the job with Keller, had been offered, you know, these holdover jobs. But they wanted to cut his pay by 22 percent, and he said, I'm not staying around working for 22 percent left. So he quit. Then he worked for Keller, and then they brought him back on. These are in the excerpts at the end of the very end of the excerpt section. When they brought him back on, he said, I don't care what you call me. As long as you pay me what I get paid when I'm working at sea. And as long as, you know, and then for three weeks he worked with a shore base crew. Then the crew was selected, and then he and the selected crew went to sea. But if the relationship to that particular vessel, the Iroquois, is significant, the point I'm making is he had not served at sea on the Iroquois as a true crew member. You're saying even though he was hired as a barge foreman, because I'm taking it that you agree that he was hired as a barge foreman, he had not worked on the Iroquois before, and so the three weeks of preparatory activity should be considered separately from the rest of his work. Is that your position? Definitely. Those three weeks, in part because, and I think we may have confused it a little by spending time talking about Chandra's and blending and stuff like that. He was pretty sure he was going to go to sea on that vessel as a member of its crew when the three weeks and the vessel was ready for its voyage. But he was not a member of the crew. No one was a member of the crew. So what does it mean then? The title barge foreman. What does that mean? Because he was hired. That's what the agency relied on, as I understand it. The barge foreman title was used by him for many of his duties, including those when he was serving at sea on the, I don't think it was quite the top dog on the vessel. I read somewhere he was third in command as the barge foreman. Second or third, I think it was. Okay. Very senior. Right. But not the foreman. There were a couple of people above him. I think that title, as he said, that didn't make any difference to him. He described himself as a crew member, but the judge noted in one of her comments that it was not meaning that in a legal sense. So if he had been hired as the barge foreman and as a crew member, then the three weeks under the two prongs in Chandris wouldn't make a difference. So we would have to say that the fact that those were not, those were land days, we would have to say that he was an expectant seaman, that he hadn't been hired as the barge foreman in a real sense with respect to those  Is that what you're saying? I'm quarreling only a little bit with the phrase of the barge foreman, simply because I'm not sure exactly what that connotes. But if you use the term seaman or crew member, I am taking the position that that first three weeks involved duties distinct from those performed when one is at sea. Now, are you arguing with the factual finding of the administrative law judge? Because I read the record the same way Judge Okuda did, that as I understood it, I thought that the administrative proceeding determined that the work that was done, this would be in the Louisiana shipyard, to modify the physical structure of the barge that he oversaw, as I understood it was determined to be furthering both his position on the barge and the mission of the barge, depending on the type of work it was going to do in the Gulf of Mexico. It certainly was characterized that way, and it was blended with the later, in order to get to the 30 percent standard, she blended the duties on the voyage itself. So my question really is standard of review. Don't we look at whether or not there is substantial evidence to support the ALJ's ruling in that regard? Well, but the statement that this furthers the mission of the barge, of the vessel, everybody who works aboard a vessel, whether they be land-based or sea-based, whether they be longshoremen loading or unloading the vessel arriving here at the port of Portland, they further the mission of the vessel. But the agency's answer is different. But I thought what the work that was done in the yard was basically to install pipe racks on the deck of the barge so that it could hold the pipe that was going to be laid in the Gulf of Mexico on the barge's mission, which, as I understood it, was to further, I assume, oil drilling and distribution activity. Well, that's true. That was part of what was done. I mean, I think there was more maintenance and general repair and a variety of things that you go through to get a vessel ready for whatever type of project it's going to be set up. But I guess what I'm really wrestling with is in order to accept your position, Mr. Babcock, we're going to have to conclude that there was not substantial evidence to support the administrative law judge's determination that this actually was work that furthered the barge's mission and therefore he was a seaman, even though the work was being performed in the yard. And I think my point in response to that is, just because work, and this was dealt with to a degree in the Heise, I'll mispronounce it, Heise or Heise decision out of this Court, that everybody who works aboard a vessel furthers its mission, whether they're loading it or unloading it or not. That's not the standard. That's the threshold. The next question is how you properly evaluate if there are different types of work. Well, the agency says we look at the totality of the circumstances and looked at the three weeks in the mix of everything else that Mr. Tracy did and said that was under the Chandra's test, that fell into seaman work. It doesn't matter that there were three weeks that were land-based work. And relied at least in part on the determination that Mr. Tracy was hired as the barge foreman. So I guess the question to you is what's the countervailing evidence that would make the agency's determination not supported by substantial evidence? Well, I will say that if I get the strong sense I'm beating a dead horse on this issue, I'm going to move on. You're hearing some screams. But the issue of whether under Chandra's, the administrative law judge or the board properly broke down the services performed and recognized, in our position, recognized that they should not have blended shore-based. I mean, everybody worked, there were no crew, a lot of people from shore working on that project. I think they shouldn't have blended that with the later voyage work and that in any event. But why should we agree with that? I mean, that's the question, right? Why should you? Right. Because Chandra says you've got to be somewhere between a moment of injury snapshot of the duties and an overall too broad a picture in making the blending and determining how you oversee them. Mr. Beckert, let me just warn you, you've already burned up your ten minutes. I know. And I'm going to go real fast. Okay. But moving from that, and we're talking about the work in foreign territorial waters, I think it's important to keep in mind that in those waters, and there's no question that that work done there fell within the Longshore Act's characterization. Well, I mean, you want to push it further than that. You want us to say that work done in foreign ports. I limit my argument, Your Honor, to territorial waters because that's all that we need in this case. That issue. He did have shore-based work in foreign ports, did he not? He had work in foreign ports that was shore-based and he had work in foreign ports that was aboard vessels afloat on those waters. If he's only aboard the ship, then it's not land-based work. It's sea work. Sea-based work. I think you need to keep in mind what that. Doesn't there have to be port-based, foreign port-based work in order to entitle him to the Longshoreman coverage? If you're using port. Are you distinguishing between shore-side and on the water in that question? Yes. Okay. I don't think there has to be, and it may come up in another case, any shore-based work to qualify him for meeting Longshore Act's status elements. Why is that if he's been on the sea and had never set foot on the shore for the past 180 days or whatever it is? Well, that's not accurate at all. The Board got a little carried away in its description of it. From October or November to March of these years we're talking about in the Asian waters, the monsoon season, Global keeps him on their payroll because a competitor will take him if they don't keep him on, and he's assigned to what are called port duties. The port duties are described in the excerpts 148 to 157 as clearly including loading and unloading of vessels and making it clear that at least in some of those cases those activities were performed on those waters. But the land – but in order to qualify, there has to be the – a sufficient amount of land-based work. Isn't that correct? This all was 5 to 6 months' land-based work. But it was in the foreign ports was the land-based work. Yes. It was in the – And so we would have to say that the land-based work in the foreign ports was work defined in the statute. I don't think you have to go that far. You have only to say that land-based work performed on foreign territorial waters satisfies the CITES. If you're on the navigable waters of the United States includes foreign territorial waters, that's the key CITES question. We think it does. Going through the definition, I've got to let Mr. Gillelan have it. If that's true and he's on those waters performing the types of work that are described in the expert – he's covered under the Longshore Act. It's only a CITES question as to those – the work activities in the foreign – Why don't we hear from – before there's harm done to you by your co-workers? Yes. I did take five, but I don't accept all the – All right. Thank you. May it please the Court. I am Joshua Gillelan, appearing on behalf of Mr. Tracy. This case may be resolved on – in our favor, both Mr. Babcock's clients' and Mr. Tracy's favor, on any of the three grounds presented. Either the contention in Lemonet that Global is estopped to deny Longshore coverage of Mr. Tracy's – all of his work for it, regardless of where it was, by the employment contracts representation that he would be covered for workers' compensation under American law, which can only be the Longshore Act. So the court says where's the reliance? I don't see any reliance here or any detrimental reliance. Do you want to explain what the reliance was and what the evidence in the record is of that? Well, there's no evidence of – precisely of reliance. That is, there – Mr. Tracy did not buy any supplemental disability insurance, but I think really what we have here is part of the consideration for his going to work for Global under the contract that Global drafted and presented him with was that he had this employment injury protection. Whether Global was at fault, in which case, during his crew member work, he would have a remedy under the Jones Act, and that would have been an American law – maritime law remedy. But if there was – if there were no negligence involved in an injury that he sustained, he wouldn't have a Jones Act remedy in any event. And this provision of the contract held out to him, yes, you will have a disability and medical benefits remedy for an employment injury throughout – any time in the course of your work for us. So the State court cases, which I'm not sure are applicable that I looked at, I didn't see any deciding without some form of reliance as construed by the State court. And our Federal cases looking at this, like Huseman, similarly identify detrimental reliance. Is there a case where there – it's only – it appears in the contract and that's enough? There are – no, because the State cases that I have cited on brief did not have    They did not have a reliance. And I don't know if it would differ with your description of those State cases. They did not – and none of them was there evidence of reliance in any direct sense. The courts in – But they took money from the guy's paycheck and they made representations so that – I mean, they describe it. Whether we would describe that as detrimental reliance, I don't know. But the State courts describe it as such. No, I think they did not. And there was – I think only in one of the cases was there any money withheld from the paycheck. That is very uncommon. Virtually all workers' compensation laws, other than Washington State's, foreclose – preclude the employer from making any deduction from pay to pay for workers' compensation insurance. So in Huseman, we said, well, he didn't point to any reliance, and so we said no estoppel in that case. Well, and that was not the entire basis for the decision in that case. And the provision in Huseman was very ambiguous. It was a – it was a statement about what the employer would do in terms of providing State workers' compensation and would – to coordinate it with Federal benefits, which were not specified in the contract in that case. And there was a disagreement within the panel in that case about what that provision in the – in the employment brochure really meant. But the reliance under this doctrine, which – I know of no State that has rejected that doctrine. And as you say, none of those cases – only one of those cases involved any evidence of actual reliance. By and large, the theory is that this is part of the consideration for the employee working for them because the employer has made this representation. And we have a very definite representation by Global in this case. So it doesn't say anything about long – long, short. It says work. It still says it's very ambiguous, and it doesn't, in fact, expressly state that you get longshoreman compensation, and it says, if any. So that's what opposing counsel focuses on. And that is covered for workers' compensation benefits, if any. No. I think Global does not rely on the phrase, if any. They only rely on the proposition that workers' compensation under the laws of the origin does not specify the longshore act in particular. I think the if any clause only means if there is a disability that's otherwise compensable under workers' compensation. Global has never said if any is a basis of ambiguity on which they rely. That is nowhere to be found in any argument that Global has made. They only argue it doesn't specify the longshore act, and maybe it means workers' compensation under some state workers' comp law. Well, this is maritime employment, and no state law can apply to this. They've – in fact, there was a claim under California law which they defeated. Why didn't he bring a claim under Louisiana law? Because Louisiana law has two provisions. It's set forth, I think, in our reply brief, one of which is it's not covered by the state – the Louisiana comp law if it's covered by the Jones Act or the Longshore Act, and the other is if the injury occurs outside of Louisiana, it is only covered by this compensation law if the claimant was hired in Louisiana or the employment is principally localized in Louisiana, which this would not satisfy. Okay. Counsel, I think you have exceeded your time as well, so let's move on. I'd pray for one minute for a rebuttal. All right. Thank you. We'll give you a little bit of time. Good morning. May it please the Court. My name is Jonathan Rolfe, and I represent the Director, Office of Workers' Compensation Programs, United States Department of Labor. The only issue that we've participated in this case is the coverage on foreign ports. And the Director's position on foreign territorial waters is that they're covered under the CITES provision of the Longshore Act. The choice of law analysis indicates that American interests in a case are sufficient to warrant the application of American law, as we believe they are in this case. And that would include work by an American worker in a foreign port, as Mr. Tracy engaged? Yes, it would. All right. And how do you distinguish the language in the Supreme Court cases that have denied benefits coverage under Title VII? For example, I'm thinking of the American Arabian oil case for work that a U.S. employee was performing in Saudi Arabia. And the general language in the Supreme Court decisions that basically have said, if you want relief of this nature, you're going to have to go to Congress and get it, because we as Federal courts don't have the power to extend the reach of Federal statutes that far. I believe what they were talking about in those cases is the presumption of territoriality, that unless Congress has said specifically that a law applies beyond our territory, that it doesn't. In this case, both the Second and the Fifth Circuit have both decided that the Longshore Act does apply extraterritorially, and that's in the language that ---- Those were before Morrison, though, right? Yes. So has ---- Morrison says fleeting references don't matter. There has to be some very clear statement of extraterritoriality. In that case, again, I would go back to the ---- what we're trying to decide here is whether or not this injury occurred on the navigable waters of the United States. And that is actually a term that goes back to maritime and admiralty jurisdiction. That's language that goes back to 1871 in the Daniel Ball. And what they said there is if the waters are capable of carrying interstate commerce, then it's navigable waters. But here's ---- How do you extend navigable waters to foreign ports and docks and wharfs and marine railway? If I could just add on to that question, because that was my question. But, I mean, Congress in the Longshoreman Act changed the definition of navigable waters to a nonhistorical form to include all of the shoreward territory, showing its intent to draw that line between the state workers' comp coverage and the longshoreman coverage. There's no indication that Congress intended navigable waters to include foreign port shoreward lands. That was what puzzled me. I would say that when they added ---- actually, those came in the 1972 amendments when they ---- Right. ---- said to put it on the land. And they didn't have to, because at that point, it was already ---- they already knew that the navigable waters of the United States included foreign territorial waters and ports. So there was no need to add ---- Well, but navigable ---- And ports? Yeah, that's the and ports. That's the problem. That's what's causing me to choke on the chicken bone here. Well, if the Court is uncomfortable with that ---- I'm very uncomfortable with that. You wouldn't have to go that far, because part of his ---- there's no question that the status provisions were met in this case. I'm sorry. Say that again. That the status provisions of the type of work that he did qualified him for a Long Shore Act. And the injuries were all ---- The status provision, it just seems to me, are based on his work in the foreign ports. So I'm not sure how he meets the status provisions when his work was not in the area that's covered by the Act. Some of his work was. Some of it was loading and unloading barges in the waters in Indonesia and Singapore. So even prior to the 72 amendments where they added the extra ports and land, it wouldn't be necessary to do that in this case, because he would have fit the pre-72 definition, because part of the work was purely just over the waters. But if we adopt the position that the Department of Labor is urging us to adopt, it would mean that a foreign employee of an American-based employer that operates docks and yards in a foreign country, if injured, could bring a Federal Long Shore and Harbor Workers' Compensation Act claim in the United States against the employer. Well, see, that's ---- really we're sort of getting into choice of law questions right now, and that's what happens under the Jones Act and the Death on the High Seas Act. And in both of those cases, the beauty of the choice of law analysis is it's the totality of the circumstances, and you could decide very early on. But the Jones Act and the Death on the High Seas Act were enacted by Congress with the specific intent to cover injuries at sea that were not otherwise coverable by the laws of any State. You're pushing the Long Shore and Harbor Workers' Act as far as I've ever seen extraterritorial extraterritoriality pushed. And I'm really having a hard time trying to conclude that Congress intended the reach of its statute this far when it didn't say so, and the Supreme Court has warned us about having Federal judges do it. Actually, I don't think we ---- I think both the Death on the High Seas Act and the Jones Act have gone that far. If you look at the cases cited on page 19 and 20 in our brief, both those acts have extended to injuries and occurrences that have ---- What I'm trying to suggest is the Jones Act is different from the Long Shore and Harbor Workers' Act by virtue of the fact that when Congress enacted DOSHA and Jones Act, they were ---- had in mind specifically injuries and deaths that occur on navigable waters, including waters all over the world, if it's an American flag vessel and a U.S. crewman and all that sort of thing. But to extend the Harbor Workers' Act, which is basically a shoreside provision, which we know from case law can include harbor workers who are aboard a vessel in navigable waters, I have in mind, I can't remember the name of the case, but the ship fitter who is at sea on sea trials, you know, that ---- those sorts of things. I don't have any problem with the result in those cases. I do have a problem extending the territorial reach of this statute as far as you're urging us to do. Well, the other thing is, part of all these extensions are, is we don't want to draw hard lines for all of these coverages where ---- and that was part of the reason why there were the 72 amendments. Congress was worried about people sort of stepping in and stepping out of coverage. And if you were to say in this case that we're absolutely going to draw the line at foreign territorial waters, you'll be driving or you'll be establishing the same arbitrary line, because you could have a case where, say, the same ship fitter went into foreign ---- just diverged into foreign territorial waters briefly, was injured right there, and then came back. So your position would be if the barge or the ship is taken to a dry dock in Singapore and this employee continues making repairs and modifications to the vessel while the ship is in dry dock in Singapore, he's covered under the Longshore and Harbor Workers' Compensation Act?  And it's be ---- if it otherwise fits the definitions. And this Court ---- And a Singaporean who is hired to work in the yard on this vessel would be covered as well? You would have to look at a lot more factors before you're ---- Well, you see, that gets to my question. Is there any limiting principle to the Director's position that, you know, navigable waters includes ports in foreign territorial seas? We would say ---- In other words, you know, does it have to be an American ---- first of all, it has to be an American company, doesn't it? These would ---- wouldn't be coverage questions. They would be choice-of-law questions. And most likely, if you didn't have American interests sufficient like that, that they'd be dismissed right away. But it wouldn't be a hard-line coverage dismissal, no. We would say that it could fit under the language navigable waters of the United States for coverage, but choice-of-law shows that there's virtually no American interest in this case. When you say choice-of-law, for instance, depending on who ---- part of it would depend on who the employer was, for instance, right? Yes, definitely. And the citizenship of the employee? Yes. As well as the situs of the work, all those things? Situs wouldn't be the factor. They would be distinct between the situs would be a coverage question, and you'd decide that first, and then if the choice-of-law came in after that, you'd start looking at the sovereign interests. And in this case, for example, you had an American employee working for an American subsidiary who had a contract that said he was covered by American ---- But take my hypothetical. Suppose the Singaporean is hired using global same-contract language, but the work is to be performed in the dry dock in Singapore. That would be a tougher question in this case. Your position has to be that he's covered, doesn't it? It would be that he would be covered under the situs provision, but because of the choice-of-law, the American interest is not sufficient enough to cover in this case, there would be no long-short coverage. An American employee working in Singapore would be covered, but not a Singaporean employee, even though they're doing identical work for the same employer on an American flag vessel. You could definitely make that distinction. Again, it would go to ---- But it's subject to what a Federal court ---- because there's no statutory limitation. You're just saying the prudential considerations that a Federal court would apply based on general principles of choice-of-law principles. Is that ---- Right. That are already used in other statutes that come from the same jurisdiction. And both DOSHA and ---- or Death on the High Seas Act and Jones Act both already use the same Lauritsen v. Larson choice-of-law principles. It's fully extraterritorial in answer to our question. It's fully extraterritorial, and there would be prudential limitations based on choice-of-law principles. Yes. All right. So the Director's position is that what you're putting forward as to coverage under the Act is divorced from the choice-of-law questions when you get to foreign territorial waters reports. Yes. They're two separate questions. I haven't thought about that. All right. I'll think about it. That's all I can say. I'm over my time here, and I'd ---- That is a surprise. Okay. Don't worry, counsel. I'll give you time since ---- All right. Thanks. Good morning. Jim Melicia appearing on behalf of Global International. First and foremost, I recognize that this Court gives special deference to the findings of the Director. However, we contend that there should be no special deference to the Director's position. In this regard, the Longshore Act ---- Is it Skidmore deference? I mean, this isn't the result of any notice and comment rulemaking. As I understand it, it's basically a litigating position. That is correct. So what kind of deference do we give it under Chevron, Skidmore, et cetera? Well, I contend there should be none, and it's based on a strict construction of the Longshore Act. The Longshore Act does not extend to foreign territorial waters. But the law is, it's entitled to, I'll call it persuasive deference, right? I would agree. All right. So what you're saying is it doesn't persuade you at all. It certainly does not. But I would like to just address a couple of the points. First and foremost, the Longshore Act explicitly states that its coverage is limited to the navigable waters of the United States. Here we have Tracy's trying to extend Longshore Act coverage into Indonesia and Malaysia. But we do have cases. I mean, you sort of go on this sequence of case law saying navigable waters includes high seas, high seas includes foreign territorial waters. And even though none of them are construing the statute, we do have that sequence of construals, constructions. That is correct, Your Honor. There is a trend by the courts to extend Longshore Act jurisdiction. However, if you notice, the Second Circuit and the Fifth Circuit stopped short. They went to the high seas, but in the decisions, they did not extend it to the foreign ports or the foreign territorial waters. And there's a distinction. But we said in DOJA that in that case, I've forgotten the name, that at least in construing the Death on the High Seas Act, that it did extend to foreign territorial waters or that language, that word. Absolutely. And they're referring to Section 39B of the Act. And if you go to Section 39B of the Act, it references the high seas, but once again, it's silent as it relates to foreign ports. I would like to note that if you did in fact extend Longshore Act coverage into foreign territorial waters and foreign ports, it would create a host of problems. Number one is what happens if you have a foreign worker and that foreign worker pursues a claim for workers' compensation benefits? There are many assumptions made by Keller that that foreign worker would be covered under a State workers' compensation scheme. If so, the United States maritime employer would have to defend that action until there was an issue addressed as it relates to the choice-of-law issues. In addition to that, it would prove to be the case that those are choice-of-law issues. Correct. Not coverage issues. Absolutely. They'd be choice-of-law issues. However, the maritime employer would have to defend those issues until there was ultimately a ruling. It would be unduly burdensome, but also be extremely costly to the maritime workers. And clearly, Congress did not intend it. What's interesting to note here is Congress did in fact amend the Act in 1972, as previously referenced by the Court. Yet when they addressed clarification to navigable waters, they went inward. Piers, wharfs, dry docks, marine railways and buildings. They made no effort whatsoever to extend it outward. And the only reference that we have here is section 39B, and that relates to the high  It's interesting to note that the Second and Fifth Circuit failed to take it further by going into the foreign ports. And, you know, here, this Court addressed the Saipan case. Well, Saipan is a U.S. territory, and under section 33 U.S.C. 9029, the term U.S. is a geographical sense, and it means the several states, territories in the District of Columbia. It makes no reference whatsoever of territorial waters. Well, can I ask you a specific question about this case? So one of the opposing counsel, I can't remember which, says it doesn't matter. We can stop at foreign territorial waters in this case, and Mr. Tracy, it would still be covered by the Longshore Act. We don't have to ask you to construe navigable waters to include foreign ports. Is that correct? No. That makes no sense whatsoever. And the reason why it makes no sense, this is the position of Keller. And the reason why it makes no sense is it makes — there's just way too many assumptions. Again, it assumes there's a workers' compensation scheme. It assumes there will be a resolution on choice of law issues. And there's just no basis for those assumptions. If we held that the Longshore coverage, the Act's coverage, extends to foreign territorial waters, would Mr. Tracy then be covered? Well, what's interesting, Tracy is covered. He's covered under the Jones Act. He filed a Jones Act claim which was accepted by Global. None of the counsels made reference to that. He had a heart attack while on the barge. That claim was accepted by Global as a Jones Act claim. Tracy does not want to pursue a Jones Act claim because there's no negligence on the employer's behalf. He doesn't want $30 per day in maintenance and cure benefits. The cure benefits would be the furnishing of medical benefits. What Tracy wants is a Longshore Act claim at a much higher compensation rate. Again, we had reference by Mr. Galillion to the contract. Well, the contract of Global and Mr. Tracy, I would agree that it's a very broad definition. Well, the problem is Global has employees from all over the world. So it goes back to the country of origin. Here, Tracy has a remedy, a Jones Act claim or a claim for workers' compensation benefits under Louisiana law. But speaking of going back to the country of origin reminds me that the contract here, right, provides, it's governed by U.S. law. Isn't that right? That is correct. All right. So isn't that an alternate way, in a sense, a way to avoid these other problems by saying, well, the parties chose U.S. law and U.S. law includes the Longshore Act? Well, Your Honor, I would agree. And so apply that without, you know, getting into all these choice of law problems because you chose it. The contract did not say Longshore Act coverage. Well, but it says United States law, right? Well, let me get that. Something like that. It's very broad. Let me look at it. It says, ''The employee's coverage for workers' compensation benefits, if any, payable under the laws of the employee's country of origin, which benefits will be provided by the employer's insurance carrier and shall be paid as a sole and exclusive remedy for any occupational injury or illness arising out of and in the course and scope of employment under this agreement.'' Again, we contend there is coverage, a Jones Act claim. There is coverage. A claim for workers' compensation benefits under Louisiana law. Mr. Galilean is asking this Court to have a very broad interpretation of that contract. And the broad interpretation is you should make an inference that it's Federal and a further inference that it relates to the Longshore Act claim. He has a Jones Act remedy. He's already filed a Jones Act claim for the heart attack. It's just that he's trying to now make that cumulative trauma claim for the orthopedic injuries falling under the purview of the Longshore and Harbor Workers' Compensation Act. And once again, Global contends that the Longshore Act, that coverage does not extend to foreign ports. Again, I wanted to just reference that section 39B, which references the high seas. Again, does not reference foreign territorial waters and ports. And if this Court should give a very expansive interpretation to the Longshore Act and extend coverage into the foreign territorial waters and ports, it really would prove � it would create a lot of problems. And it would create a lot of problems as it relates to what do you do with the foreign workers. The foreign workers would then be able to pursue claims under the Longshore Act, and I don't think that's what Congress intended. And Congress had a second bite at the apple in the 1984 amendments, and they did nothing as it relates to expanding the Longshore Act jurisdiction. But would we have to split, to go the way you're suggesting, would we have to split with the other circuits? No, I don't.  Because the Second and Fifth Circuits only said because of the high seas, but they stopped short of extending coverage to the foreign territorial waters and ports, and there's a distinction. All right. Thank you.  I will give you � but one of you gets one minute. So you can decide. You can decide which of the three of you are going to do it. Well, I guess you just � you're the representative. And that was you asked the distinction between the port and the water in the foreign territorial areas. And you asked if we were just talking about foreign territorial waters, would Mr. Tracy's work activities suffice? And the answer is, at E.R.C. it would suffice. And the answer is, at E.R.C., yes, because he engaged in the loading and unloading of major material barges and dive vessels for projects being operated out of the port.   And that's as far, in our judgment, as the facts from Keller's position need to go. I don't need to go inland. All right. All right, Mr. Gillen, I'll let you. You caught me in a generous mood. I appreciate that generosity greatly. I think the beginning point is what the Longshore Act was enacted to do in 1927. This has got nothing to do with the 1972 amendments bringing coverage ashore. What it wanted to do was take all employment injuries in the course of maritime employment, which would otherwise be within Federal maritime tort cognizance, out of the courts, out of tort claims, and provide instead a workers' compensation remedy. If this case were brought as a tort case with respect to Mr. Tracy's work aboard vessels in the Singapore shipyard, not ashore, and we don't need to go ashore. And the use of the word in port has been, as I think, confused this morning's argument. We're talking about aboard the vessels moored in the shipyard, not ashore. He was shore-based during that work in Indonesia, but he worked on navigable waters. And other authorities of this Court and others tell us that in 1920s maritime power legislation, the phrase, the high seas, includes foreign territorial waters. We have no dispute about that. So this work that Mr. Tracy did in the Singapore shipyard was performed in significant part on the high seas, even though those high seas constituted territorial waters of Indonesia. But your opponent says those same facts give rise to Jones Act coverage. No, I don't, I think, I don't know. There has never been a contention that Mr. Tracy's shore-based work in the Singapore shipyard is not on the ship moored at the harbor. You excluded shore-based work. No, no, no, no. I did not. And if he's serving afloat, if his work is afloat, then he's a seaman. No. If his work is land-based. Didn't you say to ignore the word? No, that, that, I'm sorry, this is very fundamental. Land-based and sea-based, in this context of distinguishing Longshore Act from Jones Act, does not mean it takes place aboard the vessel or ashore. No, no. Longshoremen working in port, ship repair workers working in port, aboard the vessel, that is shore-based work, even though it is work on navigable waters. That's the key distinction for Longshore or Jones Act coverage, is whether the, the, the vessel is tied up to shore when the work is done, rather than being at sea. All right. I think we have it. You are all out of time. I think we've been very generous with time this morning, and we will try and puzzle our way through this and get you an answer as best we can. We are adjourned. I thank the Court. Thank you. All rise.
judges: Tashima, Tallman, Ikuta